Donald H. Mullins on behalf of the Appellant and Plaintiff, Ms. Mary Matson. May it please the Court, this is an appeal from two jury trials, one in July of 2012 and one about a year and a half later in November of 2013. Briefly, the first trial resulted in a jury verdict in favor of Ms. Matson on the claim of hostile work environment and damages of $500,000. The second trial resulted in a verdict for Ms. Matson. The new trial... We're pretty familiar with the record. Can I start asking you some questions? Yes, Your Honor, of course. It looks to me like Ms. Matson's theory of the case from the very beginning in the first trial was that UPS was violating her seniority rights by assigning extra work to less senior male employees. So I'm trying to figure out, how does that not go or be part of core CBA territory? It seems like that gets into CBA land pretty quickly. Yes, Your Honor. It was a mix. It was the assignment of work on a daily basis, sometimes referred to as extra work, and it was also the distribution of packages on a daily basis that were hidden away by the managers to be given to male route drivers. Or sometimes allowing certain drivers to give them to other drivers. In other words, sometimes the managers were assigning them and sometimes they were allowing workers to assign them to other workers. Yes, yes, that's correct, Your Honor. That was part of the opening statement. That was part of her testimony. It was especially part of her rebuttal testimony. So I'm just trying to figure out why ultimately, in the end, it seems like it would have probably been a little better if the district court would have made that decision earlier than it did. But how isn't that not preempted? Well, what remains, Your Honor, at the conclusion of the jury determination, is only the hostile work environment claim. Let's go back to her question. Surely. Was, in fact, the theory that she deserved this work because of her seniority or, as I read her claims, it was because of a combination of things. They were assigning work to men when she should have gotten it. Essentially, whether you apply seniority, availability, or geography, I mean, she would say that as she explained what her problem was, it was you were giving it to men instead of to me, and on whatever basis you might look at, I should have gotten it. That's the claim, Your Honor. Ms. Mattson testified to that, and two other co-workers, both female, testified to that, that there was a widespread practice there in the early morning, in particular, of distributing packages to other men. And in particular. But you cloaked it, or I don't know if you were the lawyer. I probably was, Your Honor. You cloaked it in terms of extra work? At that time. And she did, too, and there had been a history of these kind of complaints that had gone and been brought forth before, hadn't there? That's true, Your Honor, but at that time, at the early stage, extra work was a colloquial, a general term. Seriously. I can understand some of that, but really, by the time the trial, especially the first trial concluded, when Ms. Mattson herself is referring to the collective bargaining agreement and saying that there's definitions there and it's all muddied, I believe she makes reference that it's all kind of muddied, I don't know that we're talking about colloquialism at that point, when she herself is pointing and relying or seems to be relying on the collective bargaining agreement. Your Honor, she did testify to the various, I'll even refer to it as a form of confusion with respect to just what extra work is. But that was her statement in the rebuttal, right? That was on rebuttal. And that seemed to be, to me, in a very specific context, which is not the general context in which this case was focused. Where is that statement in the record? That statement was on rebuttal. It was brought out by opposing counsel. All right, you don't know what page it's on. Well, go ahead. I believe it's, I've got it on 85, but I'm not sure. 85 of 100, it's document 143. 140. Document 143, page 85. I'm not sure we're talking about the same thing. Where it says, did you in fact file grievances against higher seniority employees claiming you were entitled to work? And then she says, you know, this is a very muddy area. Is that what you're looking for? Yes. What page is that? Okay. It's document number 143, page 85. All right, I will find it. 86. Because I had it and I'm missing it. And in that, may I? Well, I guess I'm struggling to understand how this case is significantly different from Perugini. And I don't know that your brief really addressed that. This is different from that case, Your Honor, clearly. How? That case focused only on the issue of part-time work for a worker. No, it's different because it's about, that was about emotional distress. And this is about discrimination. That case, yes, was about. And the emotional distress has to be outrageous, but it doesn't have any independent content. Here the independent content is that men are being favored. That's the independent content. Yes, Your Honor, that case directly focused on intentional infliction of emotional distress. A different claim, a California tort claim. And, in fact, as outrageous as the conduct might be, not the kind of non-negotiable claim that a claim for hostile work environment is. I'm not sure. I'm appreciating the difference. I know maybe Judge Berzon does, but I'm not sure how. I mean, in that case it was dealing with light work. Here we're dealing with extra work. It seems like it's referring you back to the CBA. But let's talk about the second trial. May I just touch on Your Honor's question? Sure. Light work, that work focused only on a part was derived from only a part of the collective bargaining agreement. And in that case the plaintiff, the plaintiff employee, she had actually brought a case, a claim under the duty of fair representation as well. So the focus there by both parties was on the collective bargaining agreement. I just wanted to make that point. Let me ask you before we move on to the second trial. Sure. What's your understanding of what provision of the CBA governs the assignment of additional or extra delivery work? Well, the only part that I am really aware of in that regard is referenced by the court in the order of February 13, and that was Appendix A, dealing with extra work assignments. But I want to make the point, Your Honor, that this case is a case that for a hostile work environment, that's what remained. And those acts, that conduct was outside the scope, clearly outside the scope of the collective bargaining agreement. The various eight, nine, or ten serious and outrageous acts that were directed to Ms. Madsen. The defendant UPS seeks to bring this conduct into the collective bargaining agreement. Indeed, it's separate and outside. That's what the district court ultimately decided and then allowed the second trial on the remaining acts. It seems like most of the evidence came in except for the extra work reference or even argument because the evidence supporting some of the issue regarding the extra work where the manager or supervisor got behind her or made a face and gritted his teeth, that was ultimately allowed in the second trial. So I think the district court ultimately recognized that but did, I guess, acknowledge that there was this term extra work. I think it was in the sorter's addendum. And that's what my question was really directed as, how does that affect that it was in the sorter's addendum? If you could tell me what a meaning or effect that has for your client. Well, Your Honor, just to go back a moment to a comment you made where you indicated that the heavy package incident, the gritting of his teeth and clenching of his fists, as the court mentioned, in the second trial was permitted and allowed. But that's a big issue with regard to the second trial because all of that testimony was allowed. And then the judge, His Honor, changed his mind and in effect reversed the earlier ruling and that entire incident then was removed. No, not the entire incident. It was spliced, certainly. I think that the district court judge then issued an instruction to the jury and said you can consider this part, you just can't look at the extra work sort of provision or dispute with respect to it, but allowed the description of what had occurred to come in. And so I understand what you're saying, but it was, the entire incident was not removed. All right, most of that was precluded, Your Honor. With respect to your question about extra work and the court's order and determination, the court simply said there is some confusion by and among more than one person about extra work. He covered the testimony of three or four people, of UPS and Ms. Madsen, and concluded that extra work was a term that needed interpretation under the collective bargaining agreement. Is it true that extra work is used only once in any of the collective bargaining agreements, the term extra work as such? Yes. And it doesn't refer to anything that's relevant here? That's right. And you just need to look at the agreement to do that. There's no interpretation that's required to look at that part, that particular provision and say it has nothing to do with who is delivering packages at all. No, that is, I'm sorry. Go ahead. Pardon me. That is correct. All right. So as a matter, so the one thing that we're not doing in terms of extra work is interpreting anything in the collective bargaining agreement. That's correct, Your Honor. Okay. I want to emphasize, and the question is. If it's accurate or inaccurate or anything else, it's not in the collective bargaining agreement. That's correct, Your Honor. I want to emphasize the fact that this case is a case, and what remains is a hostile work environment case. And it's the acts, the eight or ten vicious and outrageous acts, that are the proof that ultimately supported the hostile work environment claim. For example, the court said, the court referred to unwelcome conduct, conduct that was undesirable and offensive. That being hostile work environment and that not being so much the extra work assignment. That's a point I want to make very clear here, and that is that this conduct was outside and beyond the collective bargaining agreement. The conduct started in 2008 with unfair treatment of Ms. Matson, yelling at her, treating her rudely, and then it intensified. The heavy package incident occurred in May of 2008, and following that were all of the outrageous events, including her being evicted from the office of the chief executive at that facility, her being told that if she came in again and complained to him, he'd file charges against her. The incident of the choking, that's one of the reasons why she went in and talked to him. She wanted to talk to him about a worker who concerned her. No, I think we know most of this. We have a few legal problems that we're trying to deal with, and it would help if you addressed those. Okay? We understand that there's other evidence of hostile work environment other than that, which was excluded after the first trial and which was excluded in the second trial, but those seem to be the main legal issues that you're dealing with, and it would help to address those. Unless you're making a harmless error argument. Are you making a harmless error argument? And does Your Honor have a— Wait a minute. Are you making a harmless error argument? No, I'm not, Your Honor. Does Your Honor have a question of me? I don't, but I don't think that what you're— Well, I do have a question, which is on a different topic. Okay. And that is about the NLRB and EEOC documents that were admitted. Did you ever object to the admissions of those documents altogether on the basis that they're not evidence of anything? Absolutely, Your Honor. I thought you objected to them are technical grounds that they were not exactly about what this case is about, but you didn't say—did you ever say that what some other agency thought about the facts is just not evidence? I am fairly certain that I did. Your Honor is asking a fairly direct question. I'm not seeing it in the record. It looks like your objections were very discreet with respect to the admission and kind of qualified. Maybe you can take the break and maybe show us in the record where you did object to things outright. I may be getting the two cases mixed up at this point in time. I did object to that at the first trial, and I'm trying to think as to whether I did at the second trial. The question Your Honor asked about the NLRB instruction and about the Washington State Human Rights Commission instruction, both of those instructions as given were highly misleading to the jury, particularly in the second trial. The Washington State Human Rights Commission ruling only covered the first half of all of the conduct. It didn't cover the most outrageous conduct. Did UPS emphasize the NLRB ruling during the trial? Yes, they did, Your Honor. I didn't see in the closing where they relied on the NLRB ruling, and so I'm just trying to determine if that error was harmless. Well, it was argued by counsel in closing argument. Maybe you can show me the site when you – All right. Your time is now up, so we suggest that you come back in rebuttal and show us those things. I mean, your time is up. You can use it up, but you're not going to have a rebuttal time. All right. I'm sorry, Your Honor, I'm not – You have 40 seconds left. You can use them or you can save them. I'll save them. Thank you. Thank you very much. Good morning, and may it please the Court. My name is Eric Miller, and I represent UPS. It's important to be clear about exactly what the district court held and what it didn't hold on the preemption issue. The court did not hold that WLAD is preempted across the board, nor did it hold that Ms. Matson's claims as a whole were preempted. Rather, the court disaggregated the claims and went through looking at each piece of evidence separately, and it applied the rule – Ordinarily, you don't preempt evidence. Well, but what you preempt is a theory of liability under state law, and – Her theory of liability, as I understand it, was that she was discriminated against in that – not that she was discriminated – there was a hostile work environment of which one piece was that work was given to men instead of to her when she should have gotten the work. And she had several different reasons she thought she should have gotten that. Linearity, location, availability, the fact that one worker was giving work to another worker, and she – and it doesn't – and she never mentioned a collective bargaining agreement as such as being the source of this, did she? I don't know that she uttered the words collective bargaining agreement, but she repeatedly argued – her counsel argued and she testified that she had an entitlement to the work on the basis of her seniority, and she discussed in her rebuttal testimony, which was what the district court focused on – Well, my understanding is that she thought she had an entitlement to the work for – because on any criteria you look at, she should have gotten the work, one of which was seniority, another one of which was location, and another one, i.e., where the package was going as related to where she – where her grant was, and also that she was there. She kept saying, I was right there, and instead they gave it to this other guy. So there were a number of criteria that she was referring to, one of which was seniority, which she didn't identify as coming out of the collective bargaining agreement, but simply as one criteria that one could use. With respect, Your Honor, she did put it in terms of the CBA, and the clearest place to see that is at page 430 of the supplemental excerpts of record, which is page 43 of the transcript that was referenced earlier. And that's her rebuttal testimony, and she said there were two grievances settled on this matter. Well, that's true. And I think that cuts to the issue. Go ahead, I'm sorry. Yeah, I was going to follow up on that. Those two grievances had to do with female employees. It had nothing to do with the preferences towards males that her hostile work environment claim relates to. But, Harry, I want to pose a hypothetical to you and figure out how far your argument goes. If, let's say, a female worker comes in and says, I'm entitled to a certain amount of pay under the collective bargaining agreement, but only women are paid half of what they're owed, and the men all get their pay, and we have to go and sue every month for the rest of our pay. Now, the fact that that right to payment comes from the collective bargaining agreement, would that preclude a claim of that kind from going forward as a hostile work environment claim, in your view? No. The plaintiff is able, and a plaintiff can, and this plaintiff here did, to some extent, come in and present evidence of disparate treatment and say, men are being treated one way, I'm treated differently, and invite the jury to infer that it's because of gender. What she can't do is argue, as she did here, I have been treated unfairly because my rights under the CBA have been violated, and put in evidence that invites the... But that's not her argument. I see her argument as, I've been treated badly because I'm female. Men get all the good work assignments and they hide packages from me, and there's nothing in the bargaining agreement about hiding packages. I guess I just don't... You have the argument, certainly, that you've repeated, that it arises from the collective bargaining agreement, but I have a difficult time seeing that her actual assertions, factual assertions, relate in any way to the terms of the collective bargaining agreement as such. The rebuttal testimony that I mentioned a minute ago, where she was discussing the grievances, those weren't her grievances, those were earlier... Well, the rebuttal testimony seems plainly about something else. The rebuttal testimony, let me see, I did manage to find it, and let me look at it again. It was in the context of a bid with regard to full-time and part-time work. It doesn't have anything to do with this package delivery stuff at all, when she was talking about the muddy area. He was asking her whether she had ever claimed a job of a senior person, and she said she had bid on something, and it had to do with full-time and part-time work. It didn't have to do with these delivery of individual packages. It was something else. The other passage, page 43 to 44 of the transcript, is an explication by her of grievances interpreting extra work. All right, so here's my question about the grievances. It seems to me, if anything, the grievances cut in the other direction, in the sense that the whole underlying point of Alice Chalmers v. Lewick and all the cases going forward is to preserve the whole of this arbitration system in deciding contractual issues, and she tried that. And in fact, she got settlements in some instances. For example, there's a settlement that says, the company will recognize that the principles of seniority be given prime consideration in assigning additional work to unassigned geographic delivery areas of the combination air delivery drivers dispatched out of the BFI facility. The company also agrees that responsibility of dispatching stops and packages to air drivers will be that of UPS management and not at the discretion of hourly employees. So those are two issues as to which the government, we now have what seems to me is the equivalent of a decision as to what the collective bargaining agreement means. And all we have to do is look at it as if it were the collective bargaining agreement, and there's nothing to interpret. We have an interpretation through the proper system. So why does she have to do it again? Because, and here's where I take issue with one of the comments of my friend, Mr. Mullins, that what was disputed at trial between UPS witnesses and Ms. Matson was whether the packages that we were talking about, the unassigned packages. Unassigned geographic delivery areas. Isn't that exactly what you're talking about, this Kirkland stuff? Well, no, I mean, that was more, and the witnesses from UPS explained that they understood that to mean, you know, we have like a whole extra truck worth of extra shipments going to some place that's not on somebody's regular route, not individual packages which were understood to be assigned to balance out the load. The company also agrees that the responsibility of dispatching stops and packages to air drivers without UPS management are not at the discretion of hourly employees. That's another thing she continued to complain about. Right, but I think for purposes of the preemption analysis, the question is, you know, is her claim substantially dependent on an interpretation of the collective? Well, that is, and it's that line of cases makes clear that where the agreement is clear enough, you don't, there's nothing to interpret. And what I'm saying is that it seems to me that should encompass an already decided, if this is an interpretation of the agreement, it should encompass these agreed upon versions as well. In other words, you can look at this settlement and say, well, they already said they're not supposed to be doing it, and she says they're still doing it. So is she supposed to go back and grieve it again? Well, I mean, it was a disputed question. Three UPS, three different UPS witnesses testified that they did not, they did not believe that the kinds of packages that she was talking about were extra work within the meaning of the CBA. And so, I mean, I think you. Let's take the second sentence then, the company, the second one I read you. Her complaint was that the more senior of these people was always giving packages to the less senior, and he wasn't supposed to do that. And they've agreed he wasn't supposed to do that, so we're supposed to dispute that again? Well, they haven't agreed that with respect to the kinds of packages that we're talking about. It's not specific. The company also agrees that the responsibility of dispatching stops and packages to air drivers will be that of UPS management and not at the discretion of hourly employees. Well, it was management, and management was dispatching packages. But her complaint was that one hourly employee was giving it to other hourly employees behind her back. That was her complaint. Well, I mean, that's a complaint under the CBA. That's not a complaint. Why is that any different from my example of saying the CBA requires you to be paid $20 an hour, but the women are only getting paid $10? There's nothing to interpret. I guess I was coming at it maybe implicitly the same way Judge Berzon is. If you know that it's $20 an hour and the women are only getting paid $10 and they have to go fight for that extra $10, you seem to agree that that could be a hostile work environment claim because there's nothing to interpret. And why is this the same? I do still agree with you that that is a traditional, whether it's characterized as a hostile environment or simply a disparate treatment, that's a cognizable claim under this kind of statute. The problem here is that we have some evidence that is like that, and then we have from the very beginning of counsel's argument to the disputes between UPS and Matson about how principles of seniority apply to the kinds of packages that she's complaining about, her extended discussion of that and rebuttal, all of that. But essentially, the case law is also clear that 301 preemption does not apply to a defense. Yes. Your brief doesn't seem to agree with that, but the law is quite clear about that. One way to view what's happening here is she's saying, I'm entitled to this work. She's not saying I'm entitled to it. She's saying you gave the work to a man and you shouldn't have given it to a man because, as I said before, whatever the criteria are, you should have given it to me. And you say, oh, no, under the collective bargaining agreement, what? We have discretion? It's up to us? In fact, she did say she was entitled to it, and that's right at the beginning of counsel's opening statement. It's at page 603 of the supplemental excerpts. The first page of the transcript, after sort of introducing who the parties are, the first thing that counsel says by way of explaining how things went badly in the working relationship is she, Ms. Matson, will testify that in the year 2007 she noticed that extra work was not being assigned to her as was required. So not, you know, there's a component of her evidence that, you know, men were getting something and I wasn't, and that's fine. And the district court recognized that that's fine. She can present that. But to the extent she's asking the jury to say, you know, implicitly you should rule for me because my rights under the CPA were violated. The court easily cured an instruction that says that, you know, they shouldn't take into account whether it was required or not, just what happened on the ground, because that's what does matter, what happened on the ground. Now, because the district judge didn't rule on this until after the case was over, there was no opportunity to do that because he was saying there was no preemption problem up until then. I think Your Honor is correct that an instruction to that effect would have gone a long way towards solving this problem. But in the absence of that instruction, and in fairness to the district court, you know, the evidence that was being presented and the claims that she was making evolved over. I don't see that. I don't think there was anything in the rebuttal that was anything different than what was going on all along. Let me ask you a couple of questions if I can, because one of the things that did concern me is the term extra work seems to only appear in the sorter addendum. Is that correct? Yes. And that applies to sort activities. But I think Ms. Mattson was called a combo worker. Is that right? Yes. And most of her work, of her extra work, complains concerned deliveries. And so I'm trying to figure out how the CBA governs the assignment of extra deliveries. Is there no specific provision governing the assignment of extra deliveries? And if that's true, how can Ms. Mattson's claim be preempted? That is my understanding of the CBA. What's your understanding? The former, that it doesn't apply to the kinds of deliveries that she was conducting. But she obviously had a different interpretation. But it's not an interpretation. That also was clear. You look at it, it's absolutely clear. That provision only applies to sorters. Period. The end. So you agree that it only applies to sorters? Well, I mean, I. So if that's the case, then it wasn't preempted from the beginning, yet you argued that it was. I mean, what's. The question is not whose interpretation of the CBA is right. The question is, did the jury have to interpret the CBA? Yeah. But if she was not a sorter and did deliveries, then you're saying it didn't just because it was referenced and not actually preempted. I'm not sure I understand. I was a little imprecise in answering the question. The combo employees sort the same packages that they then deliver. So the assignment is made at the time they sort. So the sort agreement would cover the sorting and then the delivery. So, I mean, and that's why the sort agreement is applicable to the activities here. But why would the jury be required to interpret any provision of the collective bargaining agreement when the hostile work environment instruction did not even mention extra work or any term in the CBA? The instructions did not mention it, but so much of the testimony was about it that I mean, I think you can conceptualize what the district court ultimately did as effectively a rule 403 ruling that you recognize that you've got all of this evidence and an argument from counsel. But couldn't the jury have found for Ms. Mattson without crediting her extra work allegation and only relying on the other allegations presented at trial? I think I would agree with the district court that when you strip out and what the court said having looked at the whole trial, when you strip out the extra work allegations, it's a close question whether there's enough left to have supported her claim. And that's why the court in the exercise of its discretion thought that a new trial would be appropriate. If I can go my last concern, because it is troubling to me. Let's say you are correct. UPS is correct in its interpretation of the CBA and that Ms. Mattson has no right to work, the work in question, this extra work that we've been discussing. Does that give a license for UPS to give all the work to men? No, not at all. And to the extent that a plaintiff wants to come in and say, you know, here's me, here's my coworkers, you know, we're similarly situated except that, you know, they got all the good work and I didn't and they're men and I'm a woman. That seems to be exactly what she was saying. She was going through several different ways in which she says they were similarly situated. There's also a provision in the collective bargaining agreement that says the employer recognizes that the principles of seniority shall be given prime consideration in the everyday operation of the business. That has nothing to do with extra work, right? It's not confusing or doesn't require any interpretation. There it is. That's what it says. Well, I think prime consideration is not a self-defining term. Right. So it seems quite consistent with her argument and there's nothing more to it. I mean, she was saying there are a number of reasons why I should have gotten this work. One is I was senior to them. Another is that it was by my geographical location. Another is I was right there and so why was it given to him when I was right there, too? Those are some of the things she said. But the other things that she said were I have an entitlement to this work under the CBA. Here, look at how it's been interpreted in these other arbitration decisions which she discussed in her. Can I ask two other questions? And your time is up, but I'll let you continue. One of them is about the exclusion of the heavy package testimony. Again, odd because you don't usually preempt evidence in the second trial. How does that involve interpretation of the collective bargaining agreement? The collective bargaining agreement says that she's supposed to have assistance over 70 pounds, but that's not a dispute. So what's the dispute? There, in fact, is a dispute about the circumstances under which she's entitled to assistance and the kind of request that she has to make for assistance. And I think the clearest evidence that this implicates the CBA is. Did she raise any issue about it? She said, look, there's this 150-pound package. They were just making fun of me, and those two guys were standing there and they wouldn't help me pick it up because they were upset about the whole thing. And the supervisor's standing there and he doesn't tell him to pick it up. And then I go and I get someone else to help me with it. Now, she did have help. So in terms of the collective bargaining agreement, she did have help. She was simply saying that they were setting her up essentially to hurt herself. What does it have to do with the collective bargaining agreement? Well, and to be clear, the court recognized that all of the sort of ancillary conduct associated with the incident could come in. It's not ancillary. She said – I mean, she wasn't claiming – she did have assistance in picking up the package from a coworker, right? Eventually, yes. Right. So she wasn't – what was she – her contention was that these guys were standing right there and they wouldn't help me, and they were trying to set it up for me to get hurt, essentially, is what she's saying. But what does it have to do with whether or not she had some right under the collective bargaining agreement to have someone help her? I mean, she – and one of the pieces of evidence introduced at trial was that she had previously filed a CBA grievance based on an incident in which a supervisor did provide assistance to somebody in lifting a package. So, you know, because that was not bargaining unit work, she said. So I think that illustrates that – I mean, what this implicates and what was being encroached upon. Isn't this a fairly far-fetched way to exclude what was one of the most evocative incidents that occurred here? Not all of it, I understand that, but – I mean, to tell a jury that you can't consider the fact that, you know, two men stood there and refused to help her pick up a 150-pound package because they didn't want her to get the work. I mean, that's what the implication was, and the fact of whether they – they did it as a separate thing, but the fact that they let her stand there is not pertinent? Well, that's because the right to an entitlement or the entitlement to assistance – But suppose she has no right at all. Then why can't it just be sort of human-like? If somebody's standing there with a 150-pound package, you ought to help them pick it up, whether she has a right or not. If the evidence had been presented that way and if she hadn't repeatedly brought up the CBA and her entitlements under the CBA – She brought up the CBA with regard to that issue. And I believe that the district court referenced that in its order. Well, she could have been told not to mention the CBA during her testimony because in this instance it was, right, just don't mention it. I mean, and as I say, I think a – I don't think she did, but if she did, just don't mention it. An instruction to her or an instruction to the jury could have gone a long way towards curing this problem, but – But that isn't what you got. What you got was you can't consider it at all. Well, I mean, I think the district court, once it had already come in, had to exercise its discretion in figuring out the best way to deal with that problem so as to eliminate the – They could have just said don't consider whether it violates the CBA. Just consider whether this was an example of sexual harassment. That would have been permissible as well. But it wasn't done that way. No, but – All right. I also want to know about the NLRB and EOC documents. The law on this, I know, it's not discussed in the briefs, and do you think that the issue was raised whether these documents should have come in at all? I do not believe that it was. Should they have come in at all? What are the evidence of? What is the evidence of that the EOC looked at some evidence and concluded something? What is that evidence of other than somebody else's opinion? Maybe starting with the NLRB decision. The relevance of the NLRB decision is not so much the decision itself as the fact of the grievance because the grievance alleged many of the same things that she's complaining about in this lawsuit. And she said it was – Well, maybe the fact that she – the grievance might have come – maybe the charge might have come in as showing how she was characterizing something. But why does the opinion come in? What is it evidence of is what I want to know. The opinion provides fuller context for the grievance. The NLRB – I'm kind of troubled by the NLRB. Didn't the ruling concern Ms. Matson's unrelated allegations regarding her union activities? I mean, it didn't really deal with this. It was just some opinion. They didn't – there was no – I think they couldn't find the complaint or I don't know if the complaint was ever found to be determined what it was dealing with. So it was this kind of mysterious opinion, but yet, you know, the jury got to see it and that it was a negative result. I'm not quite sure why UPS was pushing for that. I think the point is that it wasn't unrelated. I mean, it was – Sure it was. I mean, how is it related? She's complaining about some of the same conduct, the same incidents, but alleging in that context that it was on the basis of her union activity, which is – So what? It could be both. It could be both, but it's at least some evidence from which you can infer that – The fact is, and it's very hard to explain to a jury that the NLRB isn't going to consider whether it was based on sex, because that's not their business. So obviously it's not about that. Right. I mean, I would say again that, you know, the objection that was made was not to the admission of the evidence. The objection was to the instructions, and even there that was waived in the instruction. Well, thank you. You're well over your time, so thank you very much. Thank you. Because of us, not because of you. Can I have a minute, Your Honor? Yes, you may have a minute. With respect to the NLRB instruction, I'd refer the Court to ER 5811. I did make an objection, a global objection, to the NLRB instruction. It had nothing to do with the issues of this case. I'm referring again to the second trial. There was another issue with respect to the NLRB instruction, and that is that the complaint was not introduced into evidence. During trial, His Honor said, you have to put in the complaint. He directed that to counsel for UPS. He said, this doesn't make sense without the complaint. They never did put in the complaint that Ms. Madsen filed. I objected on that basis, and notwithstanding that, he let that, he, I'm sorry, His Honor, the Court, allowed that to come into evidence. So I wanted to make that clear. But not with regard to the OCA document or the department, the sex discrimination complaint. I have to admit, I've looked. I think I objected several times to that. I haven't found it. All right. Thank you both very much. This is a complicated and interesting case. The case of Madsen v. Ocasio-Cortez is submitted, and we are in recess. Thank you.
judges: Graber, Berzon, Murguia